# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES SIMS and ANTONIO SMITH, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> NOKIA OF AMERICA CORPORATION, THE (NOKIA) ADMINISTRATIVE OVERSIGHT COMMITTEE, THE (NOKIA) PENSION & BENEFIT INVESTMENT COMMITTEE, THE (NOKIA) EMPLOYEE BENEFITS COMMITTEE, NOKIA INVESTMENT MANAGEMENT CORPORATION, and JANE AND JOHN DOES 1–30, <br><br> Defendants. | Case No. <br><br><br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**Table of Contents**

I.      INTRODUCTION ..................................................................................... 2

II.     JURISDICTION AND VENUE ................................................................ 4

III.    PARTIES ............................................................................................... 4

        A.    Plaintiffs ................................................................................... 4

        B.    Defendants ................................................................................ 5

IV.     FACTUAL BACKGROUND .................................................................... 8

        A.    The Plan .................................................................................... 8

        B.    Overview of Investment Funds ................................................ 9

        C.    The At-Issue Funds Underperformed Their Benchmarks and Comparator
              Funds ..................................................................................... 10

V.      ERISA'S APPLICABLE FIDUCIARY STANDARDS ............................. 22

VI.     FIDUCIARY AND CO-FIDUCIARY LIABILITY UNDER ERISA ............. 22

VII.    CLASS ACTION ALLEGATIONS ........................................................ 23

VIII.   CLAIMS FOR RELIEF ......................................................................... 27

IX.     PRAYER FOR RELIEF ........................................................................ 32

X.      JURY DEMAND .................................................................................. 33

Plaintiffs James Sims and Antonio Smith, on behalf of the Nokia Savings/401(K) Plan (the "Plan"), individually and on behalf of a class of its participants and beneficiaries, bring this action under 29 U.S.C. § 1132(a)(2) against Nokia of America Corporation, the (Nokia) Administrative Oversight Committee, the (Nokia) Pension & Benefit Investment Committee, the (Nokia) Employee Benefits Committee, the Nokia Investment Management Corporation ("NIMCO"), and unknown Jane and John Does to which the Nokia Defendants delegated fiduciary authority under ERISA.

## I.    INTRODUCTION

1.    This action challenges the Defendants' ongoing and consistent mismanagement of Defendant Nokia of America Corporation's employee retirement plan. The Defendants—the company itself, its retirement plan's administrative oversight and investment committees, and its advisors—have failed to prudently invest the Nokia Plan's resources, monitor the Plan's investments, remove underperforming funds from the Plan, and execute their oversight and advisory functions. Each of these failures constitutes a violation of the Employee Retirement Income Security Act of 1974, or ERISA, and together, these violations have cost the Plan and Nokia's eligible current and former employees more than $100 million.

2.    Like many large and established employers, Defendant Nokia of America Corporation offers a retirement plan to its eligible employees. The Plan, a defined contribution plan, allows participating employees to maintain individual investment accounts, which are funded by pre-tax contributions from the employees' salaries and, where applicable, matching contributions from the employer.

3.    Nokia's January 2025 Summary Plan Description ("Plan Description") promotes the Plan as an effort to provide Nokia employees with "the opportunity to build a balanced retirement portfolio that can help you meet your long-term financial and retirement goals." The Plan allows

each participant to choose how to invest his or her funds, subject to an important limitation: the participant must choose from the menu of options selected by the Plan administrators. The performance of these investments (less the deduction of any associated fees) determines how much the participant will ultimately save for retirement.

4.    Participants trust their employers and plan administrators to act as prudent and loyal fiduciaries and to prioritize employees' investment interests over their own interests. ERISA requires as much. ERISA delineates four core fiduciary duties that form the bedrock of plan governance: (a) the duty of loyalty, (b) the duty of prudence, (c) the duty to diversify investments, and (d) the duty to administer the plan according to its governing documents.

5.    These fiduciary duties are among "the highest known to the law," as they are designed to safeguard the retirement security of American workers. *See Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019). ERISA fiduciaries must discharge these duties "*solely* in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A) (emphasis added), and with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope, *id.* § 1101(a)(1)(B). The Defendants in this case breached their fiduciary duties to Nokia Plan members by mismanaging the funds that comprise the Plan.

6.    The Plaintiffs are two former Nokia employees who participated in the Plan and invested in the funds at issue. The Plaintiffs bring claims on behalf of proposed classes of all employees and former employees similarly situated. Each of the at-issue funds materially and consistently underperformed under the Defendants' supervision because the Defendants failed to monitor the Plan's underperforming investment options, remove them in a timely manner, and make prudent changes to the Plan. These breaches caused the Plan's investments to underperform and resulted in significant financial harm to the Plan and its participants.

3

7.    The Plaintiffs seek appropriate relief, including the restoration of all funds lost due to the Defendants' breaches, the removal of all imprudent investment options, and proper monitoring, as required by ERISA.

## II.    JURISDICTION AND VENUE

8.    This Court has exclusive jurisdiction over the subject matter of this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331, which provide for federal jurisdiction over actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

9.    This Court has general and specific personal jurisdiction over the Defendants because they transact business in this District, reside in this District, and have significant contacts within this District, and because ERISA provides for nationwide service of process.

10.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, the Plan is deemed to reside in this District, some or all of the ERISA violations alleged herein took place in this District, and the Plan can be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because the Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### A.    Plaintiffs

11.    Plaintiff James Sims brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C. § 1109 to protect the interests of the Plan. Mr. Sims is a participant, as defined in 29 U.S.C. § 1002(7), in the Plan during the relevant Subclass periods. Mr. Sims suffered individual injury by investing in the U.S. Large Cap Growth Equity Fund and the International Equity Fund, both of which significantly underperformed as described below.

12.     Plaintiff Antonio Smith brings this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C. § 1109 to protect the interests of the Plan. Mr. Smith is a participant, as defined in 29 U.S.C. § 1002(7), in the Plan during the relevant Subclass periods. Mr. Smith suffered individual injury by investing in the U.S. Large Cap Growth Equity Fund and the International Equity Fund, both of which significantly underperformed as described below.

13.     The Plaintiffs did not have knowledge of all material facts (including, among other things, comparisons of the Plan's investment performance relative to other available investment alternatives) necessary to understand that the Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before filing this Complaint. Further, the Plaintiffs do not have actual knowledge of the specifics of the Defendants' decision-making processes with respect to the Plan, including the Defendants' processes for monitoring and removing Plan investments, because this information is solely within the possession of the Defendants prior to discovery. For the purposes of this Complaint, the Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

**B.     Defendants**

14.     Defendant Nokia of America Corporation is a global technology company renowned for its extensive portfolio in telecommunications, network infrastructure, and advanced technologies. Nokia of America Corporation has its principal place of business in Murray Hill, New Jersey and employs more than 10,500 people.

15.     Nokia of America Corporation is both the Plan sponsor and the Plan administrator. Nokia of America Corporation is an ERISA fiduciary because it exercises discretionary authority or control over the management of the Plan; exercises authority or control, discretionary or

5

otherwise, over the management or disposition of Plan assets; provides investment advice regarding Plan assets, whether directly or indirectly, or has the authority or responsibility to do so; and/or has discretionary authority or responsibility in the administration of the Plan.

16. Defendant (Nokia) Pension & Benefit Investment Committee is an entity named in the Plan Description as an ERISA fiduciary with respect to matters relating to Plan investments. The (Nokia) Pension & Benefit Investment Committee is an ERISA fiduciary because it exercises discretionary authority or control over the management of the Plan; exercises authority or control, discretionary or otherwise, over the management or disposition of Plan assets; provides investment advice regarding Plan assets, whether directly or indirectly, or has the authority or responsibility to do so; and/or has discretionary authority or responsibility in the administration of the Plan.

17. Defendant (Nokia) Administrative Oversight Committee is an entity named in the Plan Description as an ERISA fiduciary with respect to Plan administration. The (Nokia) Administrative Oversight Committee is an ERISA fiduciary because it exercises discretionary authority or control over the management of the Plan; exercises authority or control, discretionary or otherwise, over the management or disposition of Plan assets; provides investment advice regarding Plan assets, whether directly or indirectly, or has the authority or responsibility to do so; and/or has discretionary authority or responsibility in the administration of the Plan.

18. Defendant (Nokia) Employee Benefits Committee is an entity named in the Plan Description as an ERISA fiduciary with respect to Plan administration. The (Nokia) Employee Benefits Committee is an ERISA fiduciary because it exercises discretionary authority or control over the management of the Plan; exercises authority or control, discretionary or otherwise, over the management or disposition of Plan assets; provides investment advice regarding Plan assets, whether directly or indirectly, or has the authority or responsibility to do so; and/or has discretionary

authority or responsibility in the administration of the Plan.

19.     Defendant Nokia Investment Management Corporation ("NIMCO") is a wholly owned subsidiary of Defendant Nokia of America Corporation. NIMCO is identified in Nokia's 2023 Form 5500 as providing "fiduciary services" and "investment management services" to the Plan. NIMCO is an admitted party-in-interest under the provisions of ERISA and charges the Plan for costs incurred in providing fiduciary and investment management services to the Plan. NIMCO is an ERISA fiduciary because it exercises discretionary authority or control over the management of the Plan; exercises authority or control, discretionary or otherwise, over the management or disposition of Plan assets; provides investment advice regarding Plan assets, whether directly or indirectly, or has the authority or responsibility to do so; and/or has discretionary authority or responsibility in the administration of the Plan.

20.     Together, Nokia of America Corporation, the (Nokia) Pension & Benefit Investment Committee, the (Nokia) Administrative Oversight Committee, the (Nokia) Employee Benefits Committee, and NIMCO are the "Nokia Defendants."

21.     Upon information and belief, there are additional officers, employees, member, contractors, and/or agents of the Nokia Defendants who are, or were, fiduciaries of the Plan, or managed the investments of the Plan, during the Class Period. As the identities of these persons are currently unknown, Plaintiffs reserve the right to name these persons as defendants once they are identified. These unidentified persons are herein identified as "Jane and John Does 1–30." To the extent the Nokia Defendants delegated any of their fiduciary functions to another person or entity, the nature and extent of which has not been disclosed to and is otherwise unknown to the Plaintiffs, the person or entity to which the function was delegated is also a fiduciary under 29 U.S.C.

7

§ 1002(21)(A), and is thus alleged to be a Doe Defendant.[1]

## IV.    FACTUAL BACKGROUND

### A.    The Plan

22.    Nokia's Plan is an employee pension benefit plan sponsored by Defendant Nokia of America Corporation and founded for the benefit of Nokia's current and former employees. The Plan is a "defined contribution plan"—a retirement plan in which the employee and (often) the employer both contribute to the employee's individual account under the plan. The amount in the account at distribution includes these contributions and any investment gains or losses, less any investment and administrative fees. The value of the account changes based on contributions and the value and performance of the investments, and generally, the contributions and earnings are not taxed until distribution.

23.    The Plan is subject to provisions of ERISA and is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a).

24.    During the Subclass periods, the Plan provided for retirement income for approximately 27,726 Nokia of America Corporation employees, former employees, and their beneficiaries. The Nokia Defendants exclusively controlled the selection and retention of the Plan's investment options.

25.    As of December 31, 2023, Plan participants had invested more than $9,082,191,000 into the Plan. Based on more recent data, approximately $999,450,000—or 11%—was invested in

---

[1] To the extent any predecessors to any of the named Nokia Defendants are no longer listed as a Plan fiduciary in the Plan Description, have dissolved or otherwise changed their entity structure, and/or have changed their name, they are included as Doe Defendants to the extent they exercised discretionary authority or control over the management of the Plan; exercised authority or control, discretionary or otherwise, over the management or disposition of Plan assets; provided investment advice regarding Plan assets, whether directly or indirectly, or has the authority or responsibility to do so; and/or had discretionary authority or responsibility in the administration of the Plan.

the deficient Funds, as defined below.

**B.    Overview of Investment Funds**

26.    An investment fund (or mutual fund) is a pool of money contributed by a group of investors with similar investment objectives. An investment adviser invests this pool of money in different stocks on behalf of all investors in the fund. The investment adviser manages the fund's investments in accordance with the investment objectives and strategies set forth in the fund's investment guidelines. Where funds are "actively managed"—like the funds at issue—investors rely on the professional judgment of fiduciaries and often investment advisers to make decisions about the content of and changes to the fund's portfolio of investments.

27.    Active managers run the risk that their methods and analyses, including models, tools, and data, may be flawed or incorrect and may not achieve the fund's aim. This could cause the fund at issue to lag behind its "benchmark"—the standard, pre-selected index against which the performance of the mutual fund can be measured, and which helps investors assess whether the fund is outperforming or underperforming based on the fund's investment objectives and strategy.

28.    A mutual fund's benchmark index is determined by the "house" that manages the fund (*e.g.*, Vanguard) based on factors like the fund's sector, capitalization, risk profile, and volatility. Active managers and advisers are paid to beat their benchmarks; for example, an active manager may seek to beat the S&P 500 equity index and base their investment strategy accordingly. Chronic, ongoing, or blatant underperformance is a red flag to managers and advisers that they should consider other investment options.

29.    Investment research and analysis typically drive the investment decisions of actively managed funds. Factors that an investment adviser may consider include, but are not limited to, market trends, a company's financial condition, the perceived risk of investing in a company,

9

industry and sector outlooks, and the underlying stock's performance in various market conditions.

30.    Active management offers investors the opportunity to earn superior returns through the selection of investments. But superior investment performance over time is typically driven by astute selection and distinguishing better-performing investments from underperforming investments. Bad asset allocation and poor selection generally drive long-term underperformance.

31.    As opposed to passively managed funds (such as index funds), actively managed funds have more options and opportunities to meet or outperform their benchmarks. But there is also more room for them underperform—at a cost—when investment selections are poor, unreasonable, or left unmonitored.

**C.    The At-Issue Funds Underperformed Their Benchmarks and Comparator Funds**

32.    There are at least two underperforming Funds at issue in this action: the U.S. Large Cap Growth Equity Fund and the International Equity Fund (together, the "Funds"). The Defendants should not have selected these Funds or should have removed them from the investment options available to Plan participants once their historical underperformance became apparent.

1.    <u>U.S. Large Cap Growth Equity Fund</u>

33.    The U.S. Large Cap Growth Equity Fund ("U.S. Large Cap") has been part of the Plan since at least 2000. It is an equity-heavy fund. As a large-cap growth fund, it invests primarily in larger, faster growing companies inside the United States.[2] U.S. Large Cap is heavily invested in information technology and communication services, with its top holdings including Microsoft Corp. (10.02% of fund assets); Apple Inc. (9.34%); and NVIDIA Corp. (8.95%). 93.73% of U.S.

---

[2] Large-growth portfolios invest primarily in large U.S. companies that are projected to grow faster than other large-cap stocks. Stocks in the top 70% of the capitalization of the U.S. equity market are defined as "large cap." Growth is defined based on fast growth (high growth rates for earnings, sales, book value, and cash flow) and high valuations (high price ratios and low dividend yields). Most of these portfolios focus on companies in rapidly expanding industries.

Large Cap's equities are from the United States. U.S. Large Cap has approximately $786 million in assets under management, maintaining approximately 99% of its assets in equities and 1% in cash.

34.    U.S. Large Cap's chosen prospectus benchmark is the Russell 1000 Growth Index.[3] The Russell 1000 Growth Index is independently maintained by FTSE Russell, a wholly owned subsidiary of the London Stock Exchange Group. FTSE Russell is a leading global provider of benchmarking, analytics, and data solutions for investors with more than thirty years in the business.

35.    The Russell 1000 Growth Index measures the performance of the large-cap growth segment of the U.S. stock market. It includes those Russell 1000 companies with relatively higher price-to-book ratios, higher forecast medium-term growth, and higher sales-per-share historical growth (i.e., growth companies).

36.    U.S. Large Cap's stated fund objective is "to outperform the Russell 1000 Growth Index (the 'Benchmark') over rolling three-year periods, net of total fees and expenses." Despite this goal, U.S. Large Cap has underperformed the Russell 1000 Growth Index on a cumulative, trailing-three-year basis in eight of the last nine years, including for three consecutive years from

---

[3] In general, an index is a group of investments that are tracked to measure the performance of a specific industry or sector of the market. These indices, such as the S&P 500, are maintained by financial-services companies. These indices are regularly used to measure the performance of funds targeting similar market segments or industries.  In contrast to active investors that try to "beat" the index, passive "index funds" attempt to mirror them by owning all (or a representative sample) of the companies in that index. Index funds are typically considered lower risk compared to investing in individual stocks, because they diversify investments across a variety of companies and track large, stable markets, which tend to grow over time. Here, U.S. Large Cap was not able to outperform its chosen prospectus benchmark index despite the prospectus benchmark being a large, diversified index with a lower risk profile.

2016–2018.[4] In fact, on an annualized basis, U.S. Large Cap has undeformed the Russell 1000 Growth Index on a 3-year, 5-year, and 10-year basis, as well as underperforming *since the inception of the fund.*

37.    To analyze U.S. Large Cap's performance, it is compared not only to the Russell 1000 Growth Index, but also to four peer funds selected from major market vendors and filtered by similar characteristics, such as Morningstar category, investment makeup, and risk ratio (the "Large Cap Comparator Funds"). U.S. Large Cap underperformed the four Large Cap Comparator Funds for a sustained period of multiple years on a cumulative, trailing-three-year basis. The Large Cap Comparator Funds are JP Morgan Large Cap Growth R6 ("JP Morgan Large Cap" or "JLGMX"); Fidelity Growth Company Fund ("Fidelity Growth" or "FDGRX"); T. Rowe Price All-Cap Opportunities Fund ("T. Rowe All-Cap" or "PRWAX"); and Vanguard Growth Index Admiral ("Vanguard Growth" or "VIGAX").

38.    U.S. Large Cap's sustained underperformance is detailed on both a per-fund and a composite basis in Figure A, below:

---

[4] For purposes of this Complaint, "trailing-three-year" performance refers to the cumulative difference in annual returns between the at-issue fund and the average of its comparator funds over a rolling three-year period.

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **U.S. Large Cap** | **-0.59** | **31.55** | **2.53** | **37.36** | **32.71** | **26.55** | **-26.69** | **38.1** | **32.47** | |
| *JPMorgan Large Cap Growth R6 (JLGMX)* | -1.74 | 38.37 | 0.57 | 39.39 | 56.42 | 18.79 | -25.21 | 34.95 | 34.17 | |
| *Fidelity Growth Co. Fund (FDGRX)* | 6.01 | 36.76 | -4.53 | 38.42 | 67.51 | 22.67 | -33.78 | 47.23 | 37.19 | |
| *T. Rowe Price All-Cap Opp. Fund (PRWAX)* | 1.4 | 34.57 | 1.28 | 35.03 | 44.71 | 20.85 | -21.32 | 29.03 | 25.19 | |
| *Vanguard Growth Index Admiral (VIGAX)* | 6.12 | 27.8 | -3.34 | 37.23 | 40.19 | 27.26 | -33.14 | 46.77 | 32.66 | **Avg.** |
| **Delta[5]** | **-3.54** | **-2.83** | 4.04 | **-0.16** | **-19.50** | 4.16 | 1.67 | **-1.40** | 0.17 | **-1.93** |
| **Cumulative Trailing 3-Year** | **-3.78** | **-3.88** | **-2.33** | 1.05 | **-15.62** | **-15.50** | **-13.67** | 4.44 | 0.45 | |

**Figure A**

39.    All of the data presented herein was available in real time to the Defendants throughout the Subclass Periods.

40.    The Large Cap Comparator Funds are described more fully below.

41.    **JP Morgan Large Cap.** JP Morgan Large Cap is a publicly available, equity-heavy, large-cap growth fund. As of May 31, 2025, it maintains approximately 99.7% of its assets in equities and approximately 0.3% in cash. It has approximately $114.3 billion in assets under management and is benchmarked against the Russell 1000 Growth Index. Its top three holdings are

---

[5] "Delta" is the difference between the fund performance and an average of the Large Cap Comparator Funds for that calendar year.

NVIDIA Corp. (at 8.25% of assets); Microsoft Corp (8.12%); and Amazon.com Inc. (5.92%). 95.7% of JP Morgan Large Cap's portfolio are equities from the United States, and it is rated with a "Silver" level medalist rating and five out of five stars for historical performance by Morningstar.[6] Morningstar places JP Morgan Large Cap in the "Large Growth" category.

42.    **Fidelity Growth.** Fidelity Growth is a publicly available, equity-heavy, large-cap growth fund. It maintains approximately 95.8% of its assets in equities, approximately 3.9% of its assets in other, unspecified categories, and approximately .3% in cash. It has approximately $69 billion in assets under management. It is benchmarked against the Russell 3000 Growth Index.[7] Its three top holdings are NVIDIA Corp. (at 15.91% of assets); Microsoft Corp. (8.29%); and Apple Inc. (7.41%). 93.2% of Fidelity Growth's portfolio are equities from the United States. It is rated with a "Silver" level medalist rating and five out of five stars for historical performance by Morningstar. Morningstar places Fidelity Growth in the "Large Growth" category.

43.    **T. Rowe All-Cap.** T. Rowe All-Cap is a publicly available, equity-heavy, large-cap growth fund. It maintains approximately 96% of its assets in equities, 3.3% of its assets in cash, and

---

[6] Morningstar, Inc. is a market-leading provider of independent financial investment research that is depended on by many investors for reliable financial analysis. It provides detailed data of fund holdings, historical performance, and even fund managers' experience and backgrounds. As part of its analysis, it assigns ratings for funds from one to five stars based on historical performance, and a "medalist" rating of Gold, Silver, or Bronze for the three levels of positive ratings (where positive returns may be expected relative to the fund's index or category over the long term), Neutral (for the top 70% of underperforming funds), and Negative (for the bottom 30% of underperforming funds). These differing medalist ratings were included to indicate that Plaintiffs do not rely upon (and did not cherry-pick) only the highest-rated Morningstar funds as relevant comparator funds. Morningstar also assigns funds to categories based on their general investment strategy and asset makeup, such as the "Large Growth" category, in which Morningstar places JP Morgan Large Cap (and all of the Large Cap Comparator Funds).

[7] The Russell 3000 Growth Index uses a larger sample of companies than the Russell 1000 Growth Index, but otherwise applies the same methodology, so it functions as a very similar benchmark. Of note, Morningstar also uses the Russell 1000 Growth Index as a benchmark for Fidelity Growth in its fact sheets.

approximately 0.7% of its assets in other, unspecified categories. It has approximately $15.6 billion in assets under management. It is benchmarked against the Russell 3000 Index. Its three top holdings are Microsoft Corp. (at 5.82% of assets); Apple Inc. (5.18%); and NVIDIA Corp. (3.59%). 88.7% of T. Rowe All-Cap's portfolio are equities from the United States. It is rated with a "Silver" level medalist rating and four out of five stars for historical performance by Morningstar. Morningstar places T. Rowe All-Cap in the "Large Growth" category.

44. **Vanguard Growth.** Vanguard Growth is a publicly available, passively managed, equity-heavy, large-cap growth fund. It maintains approximately 99.9% of its assets in equities and 0.1% of its assets in cash. It has approximately $293.9 billion in assets under management.  It is benchmarked against the CRSP US Large Cap Growth Index. Its three top holdings are Microsoft Corp. (at 11.32% of assets); NVIDIA Corp. (10.30%); and Apple Inc. (10.08%). 99.6% of Vanguard Growth's portfolio are equities from the United States. It is rated with a "Gold" level medalist rating and four out of five stars for historical performance by Morningstar. Morningstar places Vanguard Growth in the "Large Growth" category.

45. Each of the Large Cap Comparator Funds is similar to U.S. Large Cap in its investment strategy, overall investment makeup, and approach. As such, each is a suitable benchmark comparison fund against which U.S. Large Cap's performance may be meaningfully compared.

46. U.S. Large Cap does not have a Morningstar rating or category because it is a privately managed fund that is specifically made available to investors in the Plan. Nevertheless, the Morningstar ratings demonstrate that U.S. Large Cap has underperformed comparator funds with a broad range of subjective value ratings, all of which are in the Morningstar category that would be applicable to U.S. Large Cap. In other words, U.S. Large Cap is not simply

15

underperforming the "best" funds on the open market—it is underperforming relative to multiple appropriate benchmark funds.

47. As demonstrated above, U.S. Large Cap underperformed the Large Cap Comparator Funds on a cumulative, trailing three-year basis by 3.78% in 2016, 3.88% in 2017, and 2.33% in 2018. While these percentages may not seem drastic, they constitute millions of dollars of losses for the Plan and its participants. Further, sustained underperformance of this magnitude is regularly considered to be sufficient underperformance to trigger a fiduciary's duty to replace a fund for underperformance.

48. Despite its consistent underperformance, as of April 2025, the Plan invested approximately $787,760,000 in U.S. Large Cap, and the Defendants did not remove the fund from the Plan's investment options. The amounts the Plan invested in years prior are unknown and will be ascertained through discovery.

49. Rather than continuing to invest, the Plan should have removed U.S. Large Cap as an offering in 2019 at the latest and replaced it with a better-performing, publicly available fund, such as one of the better-performing Large Cap Comparator Funds, or otherwise altered the makeup of U.S. Large Cap to better reflect one of the Large Cap Comparator Funds.

50. The Plan ultimately removed U.S. Large Cap as an offering effective May 28, 2025, and replaced it with a passively managed option. The belated removal of U.S. Large Cap does not cure the Nokia Defendants' failure to remove it from the Plan by 2019 at the latest. Indeed, from 2019 through May 28, 2025, Plan participants invested in U.S. Large Cap continued to sustain losses that they should not have sustained due to the Nokia Defendants' failure to remove or improve U.S. Large Cap as an offering at an earlier date.

16

*ii. International Equity Fund*

51.    The International Equity Fund ("International Equity") has been part of the Plan since at least 2000. It is an equity-heavy fund. It has approximately $213.69 million in assets under management. As an international multi-cap core fund, International Equity invests primarily in developed and emerging international markets. It maintains approximately 94.41% of its assets in equities and approximately 5.43% of its assets in cash. It is heavily invested in financial services and industrial sectors, with some information technology and other holdings. Its top holdings include the Nokia JP Morgan Money Market Fund (at 2.85% of fund assets); Taiwan Semiconductor Manufacturing Co. Ltd. (2.16%); and ASML Holding NV (1.51%). Approximately 99% of its assets are from outside the United States. International Equity's stated fund objective is "to outperform the MSCI ACW (All Country World) ex USA Standard Net Dividend Index (the 'Benchmark') over a full market cycle, net of total fees and expenses."

52.    International Equity's selected benchmark, the MSCI ACW ex USA Standard Net Dividend Index (the "MSCI ACW Ex USA Index"), is a market capitalization-weighted index that measures the performance of large- and mid-cap stocks in developed and emerging market countries, excluding the United States, with net dividends reinvested and calculated in U.S. dollars. It includes a wide range of industries and countries, with major country weights including Japan, the United Kingdom, China, Canada, and France. Common sectors represented in the index include Financials, Industrials, and Information Technology.

53.    Despite International Equity's stated fund objective "to outperform the MSCI ACW (All Country World) ex USA Standard Net Dividend Index (the 'Benchmark') over a full market cycle, net of total fees and expenses," International Equity has trailed the MSCI ACW Ex USA Index on a cumulative, trailing-three-year and calendar-year basis for six of the last nine years,

17

including for four consecutive years from 2018–2021. In fact, on an annualized basis, International Equity has underperformed over a 5-year and 10-year period, as well as underperforming *since the inception of the fund.*

54.    To analyze International Equity's performance, it is compared not only to its prospectus benchmark, but also to four peers selected from major market vendors and filtered by similar characteristics, such as category, investment makeup, and risk ratio. These four peer funds (the "International Comparator Funds") are BlackRock Advantage International Instl ("BlackRock International" or "BROIX"); DFA Emerging Markets Core Equity 2 ("Emerging Markets" or "DFCEX"); American Funds Intl Gr and Inc F2 ("American International" or "IGFFX"); and JPMorgan International Equity I ("JPMorgan International" or "VSIEX").

55.    **BlackRock International.** BlackRock International is a publicly available, equity-heavy, foreign large-blend fund. It maintains approximately 99% of its assets in equities and approximately 1% of its assets in cash. It has approximately $5.3 billion in assets under management. It is benchmarked against the MSCI EAFE Index. Its top three holdings are SAP SE (at 2.74% of assets); Novartis AG Registered Shares (2.19%); and ASML Holding NV (2.18%). 99.2% of BlackRock International's portfolio is invested in equities from outside the United States. It is rated with a "Silver" level medalist rating and five out of five stars for historical performance by Morningstar. Morningstar places BlackRock International in the "Foreign Large Blend" category.

56.    **Emerging Markets.** Emerging Markets is a publicly available, equity-heavy, diversified emerging markets fund. It has approximately $30.2 billion in assets under management. It maintains approximately 99% of its assets in equities and approximately 1% of its assets in cash. It is also benchmarked against the MSCI ACW Ex USA Index, as well as the MSCI EM NR USD.

Its three top holdings are Taiwan Semiconductor Manufacturing Co Ltd (at 4.43% of assets); Tencent Holdings Ltd (2.91%); and Samsung Electronics Co Ltd (1.52%). 98.72% of Emerging Markets' portfolio is invested in equities from outside the United States. It is rated with a "Bronze" level medalist rating and four out of five stars for historical performance by Morningstar. Morningstar places Emerging Markets in the "Diversified Emerging Markets" category, "Large Blend" investment style, with a similar makeup and approach to International Equity.

57. **American International.** American International is a publicly available, equity-heavy, foreign large-blend fund. It maintains approximately 96.33% of its assets in equities, 0.46% of its assets in cash, and approximately 3.21% of its assets in other, unspecified categories. It has approximately $17.2 billion in assets under management. It is also benchmarked against the MSCI ACW Ex USA Index. Its three top holdings are Taiwan Semiconductor Manufacturing Co Ltd (at 3.13% of assets); BAE Systems PLC (2.27%); and TotalEnergies SE (2.05%). 92.5% of American International's portfolio is invested in equities from outside the United States. It is rated with a "Gold" level medalist rating and three out of five stars for historical performance by Morningstar. Morningstar places American International in the "Foreign Large Blend" category.

58. **JPMorgan International.** JPMorgan International is a publicly available, equity-heavy, foreign large blend fund. It maintains approximately 95.6% of its assets in equities, 1.97% of its assets in cash, and 2.41% of its assets in other, unspecified categories. It has approximately $5 billion in assets under management. It is benchmarked against the MSCI EAFE Index. Its three top holdings are Sony Group Corp. (at 2.97% of assets); Safran SA (2.40%); and Nestle SA (2.28%). All of JPMorgan International's equities are from outside the United States. It is rated with a "Silver" level medalist rating and three out of five stars for historical performance by Morningstar. Morningstar places JPMorgan International in the "Foreign Large Blend" category.

19

59.     Each of the International Comparator Funds is similar to International Equity in its investment strategy, overall investment makeup, and approach. As such, each is a suitable benchmark comparison fund against which International Equity's performance may be meaningfully compared.

60.     International Equity does not have a Morningstar rating because it is a privately managed fund that is specifically made available to investors in the Plan.

61.     As demonstrated below, International Equity underperformed the International Comparator Funds on a cumulative, trailing three-year basis by 3.45% in 2018, 4.51% in 2019, and 7.87% in 2020. While such losses may not seem drastic as a percentage number, they constitute millions of dollars of losses for the Plan and its participants. Further, sustained underperformance of this magnitude is regularly considered to be sufficient underperformance to trigger a fiduciary's duty to replace a fund for underperformance.

62.      This sustained underperformance is detailed on both a per-fund basis and a composite basis in Figure B, below.

| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | |
|---|---|---|---|---|---|---|---|---|---|---|
| **International Equity Fund** | **3.65** | **28.44** | **-17.02** | **20.76** | **6.49** | **2** | **-13.73** | **15.52** | **7.31** | |
| *BlackRock Advantage International Instl (BROIX)* | 3.23 | 24.20 | -15.05 | 21.61 | 7.36 | 13.02 | -13.46 | 19.44 | 6.77 | |
| *DFA Emerging Markets Core Equity I (DFCEX)* | 12.35 | 36.55 | -15.25 | 16.04 | 13.86 | 5.83 | -16.4 | 15.45 | 7.32 | |
| *American Funds Intl Gr and Inc F2 (IGFFX)* | 2.42 | 26.32 | -14.19 | 27.42 | 8.06 | 10 | -15.25 | 15.59 | 3.57 | |
| *JPMorgan International Equity I (VSIEX)* | 1.62 | 29.73 | -17.84 | 27.2 | 13.17 | 11.77 | -19.63 | 17.91 | 1.42 | **Avg.** |
| **Delta** | **-1.25** | **-0.76** | **-1.44** | **-2.31** | **-4.12** | **-8.16** | 2.46 | **-1.58** | 2.54 | **-1.62** |
| **Cumulative Trailing 3-Year** | 1.68 | 5.92 | **-3.45** | **-4.51** | **-7.87** | **-14.59** | **-9.83** | **-7.23** | 3.42 | |

**Figure B**

63. Despite this underperformance, as of May 2025, the Plan invested $213,690,000.00 in International Equity. The amounts the Plan invested in years prior are unknown and will be ascertained through discovery.

64. The Plan should have removed International Equity as an offering in 2021 at the latest and replaced it with a better-performing, publicly available fund, such as one of the better-performing International Comparator Funds, or otherwise altered the makeup of International Equity to better reflect one of the International Comparator Funds.

21

## V.     ERISA's Applicable Fiduciary Standards

65.     Plaintiffs allege breaches of ERISA's duty of prudence. The boundaries of this duty are defined in Section 404(a) of ERISA and are straightforward.

66.     ERISA's duty of prudence requires fiduciaries to discharge their responsibilities "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B).

67.     Accordingly, even in a defined contribution plan in which participants choose their investments from a selection of funds, plan fiduciaries must conduct an independent evaluation to determine which investments they may prudently include in the plan's menu of options. This duty is ongoing.

68.     As part of the duty of prudence, plan fiduciaries also have "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). That "continuing duty" exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Id.* If an investment is imprudent, a fiduciary "must dispose of it within a reasonable time." *Id.* (citation omitted).

## VI.     Fiduciary and Co-Fiduciary Liability Under ERISA

69.     Under 29 U.S.C. § 1109, plan fiduciaries are personally liable to make good to the Plan any harm caused by their fiduciary breaches. Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

70.     29 U.S.C. § 1132(a)(2) is the enforcement mechanism for 29 U.S.C. § 1109. It enables participants and beneficiaries to bring civil actions to seek appropriate relief under 29

22

U.S.C. § 1109.

71.    ERISA also provides for co-fiduciary liability where a fiduciary knowingly participates in, or knowingly fails to cure, a breach by another fiduciary. Specifically, under 29 U.S.C. § 1105(a), a co-fiduciary shall be liable for a breach of fiduciary duty by another fiduciary if:

a.    he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

b.    by his failure to comply with 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

c.    he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## VII.    CLASS ACTION ALLEGATIONS

72.    Section § 1132(a)(2) of ERISA authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a). The Plaintiffs bring this suit in a representative capacity on behalf of the Plan and its participants and beneficiaries pursuant to 29 U.S.C. § 1132(a), seeking appropriate Plan-wide relief under 29 U.S.C. § 1109 to protect the interests of the Plan.

73.    Acting in their representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to a direct individual action on behalf of the Plan under 29 U.S.C. § 1132(a)(2), the Plaintiffs seek to certify this action as a class action on behalf of participants and beneficiaries of the Plan. Specifically, the Plaintiffs seek to certify, and to be appointed as representatives of, the following subclasses, which together form the Class:

23

**The U.S. Large Cap Growth Equity Fund Subclass**

All participants and beneficiaries of the Plan who invested in the U.S. Large Cap Growth Equity Fund from 2019 through the date of judgment, excluding the Defendants, any of their directors, and any officers or employees of the Defendants with responsibility for the Plan's investment or administrative function.

**The International Equity Fund Subclass**

All participants and beneficiaries of the Plan who invested in the International Equity Fund from 2019 through the date of judgment, excluding the Defendants, any of their directors, and any officers or employees of the Defendants with responsibility for the Plan's investment or administrative function.

74.     This action meets the requirements of Federal Rule of Civil Procedure 23 and is certifiable as a class action for the following reasons:

    a.  Each Subclass includes thousands of members and is so large that joinder of all its members is impracticable.

    b.  The members of the Class are ascertainable from the Nokia Defendants' books and records.

    c.  There are numerous questions of law and fact common to the Class and each Subclass because the Defendants owed the same fiduciary duties to the Plan and all of its participants and beneficiaries and took a common course of action and nondisclosure as alleged herein as to the Plan, which affected all Subclass members through their participation in the Plan in the same way.

    d.  Thus, questions of law and fact common to the Class and each Subclass include, but are not limited to, the following: (i) whether each Defendant is a fiduciary liable for the remedies provided by 29 U.S.C. § 1109(a); (ii) whether the fiduciaries of the Plan breached their duties to the Plan by employing an imprudent process for monitoring and evaluating Plan investment options; (iii) whether the fiduciaries of the Plan

24

breached their duties to the Plan by retaining an imprudent investment for an unreasonable amount of time; (iv) whether the Plaintiffs' claims of an imprudent process require similar inquiries and proof of the claims, and therefore implicate the same set of concerns, for all proposed members of the Class and Subclasses; (v) what losses to the Plan resulted from each breach of fiduciary duty; and (vi) what Plan-wide equitable and other relief the Court should impose in light of the Defendants' breaches.

e.  The Plaintiffs' claims are typical of the claims of the Class and Subclasses because the Plaintiffs were Plan participants who invested in the deficient Funds during the Class Periods, and all participants in the Plan who invested in the deficient Funds were harmed by the Defendants' misconduct.

f.  The Plaintiffs are adequate representatives of the Class and Subclasses because they participated in the Plan during the Class Periods, invested in the deficient Funds, have no interests that conflict with the Class or Subclasses, are committed to the vigorous representation of the Class and Subclasses, and have engaged experienced and competent attorneys to represent the Class and Subclasses.

g.  There are no substantial individualized questions of law or fact among the Class or Subclass members on the merits of this action.

75.    The prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for the Defendants with respect to the discharge of their fiduciary duties to the Plan and their personal liability to the Plan under 29 U.S.C. § 1109(a). Moreover, adjudications by individual participants and beneficiaries regarding the

25

alleged breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

76.     Additionally, or in the alternative, certification under Rule 23(b)(2) is appropriate because the Defendants have acted or refused to act on grounds that apply generally to the Subclasses, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Subclasses as a whole. The Plaintiffs seek reformation of the Plan to include only prudent investments, which will benefit them and other Plan participants.

77.     Additionally, or in the alternative, this action may be certified as a class under Rule 23(b)(3). A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be relatively small and it is impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no Class or Subclass member has an interest in individually controlling the prosecution of this matter, and the Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

78.     Additionally, or alternatively, this action may be certified as to particular issues under Rule 23(c)(4), including but not limited to the Defendants' liability to the Class and Subclasses for the Defendants' imprudent conduct.

79.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and Subclasses and is best able to represent the interests of the Subclasses under Rule 23(g).

26

## VIII.  CLAIMS FOR RELIEF

### Count I
**Breaches of Fiduciary Duty of Prudence**
**Violations of ERISA, 29 U.S.C. § 1104**
(Plaintiffs, individually and on behalf of the Class and Subclasses, against all Defendants)

80.    Plaintiffs re-allege and incorporate herein by reference each of the allegations contained in paragraphs 1–79.

81.    As alleged above, Defendants were fiduciaries of the Plan under 29 U.S.C. § 1002(21)(A).

82.    ERISA § 404, 29 U.S.C. § 1104, requires ERISA fiduciaries to perform their fiduciary duties and responsibilities prudently, as would an experienced ERISA fiduciary, and loyally, exclusively in the interest of the Plan and its participants for the purpose of providing benefits.

83.    The Defendants' fiduciary duties include administering the Plan with the care, skill, diligence, and prudence required by ERISA. As such, the Defendants were obligated to evaluate and monitor the Plan's investments on an ongoing basis, eliminate imprudent investments, and take all necessary steps to ensure the Plan's assets are invested prudently.

84.    ERISA's duty of prudence involves a continuing duty to monitor investments and remove imprudent ones.

85.    Under ERISA, the Defendants are responsible for evaluating and monitoring the Plan's investments on an ongoing basis, eliminating imprudent investments, and taking all necessary steps to ensure the Plan's assets are invested prudently.

86.    The Defendants have breached their fiduciary duties by failing to establish and follow a prudent process for investigating, evaluating, and monitoring investments. Their fiduciary failures resulted in a Plan comprised of deficient Funds that were not suitable for the Plan and were

27

underperforming compared to other reasonable and prudent choices.

87.   Likewise, the Defendants have breached their fiduciary duties by failing to select and monitor adequate and reasonable investment alternatives from which participants could choose to invest their accounts.

88.   By failing to adequately consider or include less risky and better-performing investment options for the Plan, the Defendants failed to discharge their duties with the care, skill, prudence, and diligence that a prudent fiduciary acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

89.   Likewise, by failing to remove the deficient Funds within a reasonable time despite their historical underperformance relative to their relevant benchmark index and comparator funds, the Defendants breached their fiduciary duty of prudence.

90.   As a direct and proximate result of the Defendants' breaches of fiduciary duties, the Plan and each of its participants who invested in the deficient Funds have suffered millions of dollars in damages and lost-opportunity costs which, in some cases, continue to accrue.

91.   The Defendants' breaches of fiduciary duty have substantially impaired the Plan's use, value, and investment performance for the Plaintiffs and all Class members.

92.   The Defendants' actions and failures to act have violated the duties of prudence contained in ERISA § 404(a) and continue to do so.

93.   ERISA § 502(a)(2) permits plan participants, such as the Plaintiffs and the Class, to bring civil actions for "appropriate relief" under ERISA § 409.

94.   Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a), must "make good" to the plan the losses to the plan resulting from its violations, and is "subject to such other equitable or remedial relief as the court may deem

28

appropriate."

95.      Thus, under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the Defendants are liable, in an amount to be determined at trial, for all losses to the Plan caused by their violations of ERISA § 404(a) and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

96.      Under ERISA § 502(a)(3), the Defendants are also subject to appropriate equitable relief including, but not limited to, constructive trust and surcharge.

### Count II
### Failure to Monitor Delegated Fiduciaries
(Plaintiffs, individually and on behalf of the Class and Subclasses, against the Nokia Defendants)

97.      Plaintiffs re-allege and incorporate herein by reference the allegations set forth in paragraphs 1–79.

98.      As ERISA fiduciaries, the Nokia Defendants had a duty to monitor the performance of each individual or entity to whom they delegated fiduciary responsibilities, including but not limited to each other and the Doe Defendants.

99.      A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

100.    To the extent that any of the Nokia Defendants' fiduciary responsibilities were delegated to another fiduciary, the Nokia Defendants' monitoring duty included an obligation to ensure that any delegated tasks were performed prudently and loyally.

101.    The Nokia Defendants breached their fiduciary monitoring duties by, among other things:

    a.    failing to monitor their appointees, evaluate their performance, or have a system in place for doing so, and standing idly by as the Plan suffered major losses as a result

29

of their appointees' imprudent actions and omissions with respect to the Plan;

b.   failing to monitor their appointees' fiduciary processes; and

c.   failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan to the detriment of Plan participants' retirement savings.

102.   Each fiduciary that delegated its fiduciary responsibilities likewise breached its fiduciary monitoring duty by, among other things:

a.   failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered major losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.   failing to monitor its appointees' fiduciary processes;

c.   failing to implement a process to ensure that the appointees monitored the performance of Plan investments; and

d.   failing to remove appointees whose performance was inadequate in that they continued to allow imprudent investment options to remain in the Plan, all to the detriment of Plan participants' retirement savings.

103.   As a direct and proximate result of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses. Had the Nokia Defendants and any other delegating fiduciaries prudently discharged their fiduciary monitoring duties, the Plan would not have suffered these losses.

## Count III
### Breach of Co-Fiduciary Duties
### Violations of ERISA § 405(a)(1)–(3), 29 U.S.C. § 1105(a)(1)–(3)
(Plaintiffs, individually and on behalf of the Class and Subclasses, against all Defendants)

104.    Plaintiffs re-allege and incorporate herein by reference the allegations set forth in paragraphs 1–79.

105.    A fiduciary with respect to a plan is liable for the breach "of another fiduciary" for the same plan if "he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach." ERISA § 405(a)(1).

106.    An ERISA fiduciary is also liable for the breach "of another fiduciary" if, "by his failure to comply with [his fiduciary duties] in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach," ERISA § 405(a)(2), or if "he has knowledge of a breach by some other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach," ERISA § 405(a)(3).

107.    Pursuant to § 405 of ERISA, the Defendants are also liable as co-fiduciaries with respect to the above-described violations because they participated knowingly in their co-fiduciaries' breaches; enabled other fiduciaries to violate ERISA by virtue of their own breaches of fiduciary duty (such as failing to adequately monitor their co-fiduciaries); enabled their co-fiduciaries to commit the breaches; and failed to make any reasonable efforts to remedy the breaches.

108.    ERISA § 502 permits Plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409.

109.    Under ERISA § 409(a), a fiduciary that violates any of ERISA's duties, including ERISA § 405(a)(1), (a)(2), and (a)(3), must "make good" to the Plan the losses to the Plan resulting from its violations of ERISA § 405(a)(1), (a)(2), and (a)(3), and are "subject to such other equitable

31

or remedial relief" as the Court "may deem appropriate."

110.    Thus, the Defendants are liable, in an amount to be determined at trial, for the losses to the Plan caused by their violations of ERISA § 405(a)(1), (a)(2), and (a)(3), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

111.    Under ERISA § 502(a)(3), the Defendants are also subject to appropriate equitable relief, including but not limited to, constructive trust and surcharge.

## IX.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, on behalf of the Plan, and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

A.    Find and adjudge that the Defendants have breached their fiduciary duties, as described above;

B.    Find and adjudge that the Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

C.    Order the Defendants to make good to the Plan the losses resulting from each breach of fiduciary duty and to restore to the Plan any profits resulting from each breach of fiduciary duty;

D.    Find and adjudge that the Defendants are liable to the Plan for appropriate Plan-wide equitable relief, including but not limited to restitution and disgorgement;

E.    Determine the method by which Plan losses under 29 U.S.C. § 1109(a) should be calculated;

F.    Order the Defendants to provide all accountings necessary to determine the amounts the Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

32

G.    Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

H.    Impose surcharge against the Defendants and in favor of the Plan all amounts involved in any transactions or fiduciary breaches that were in violation of ERISA;

I.    Reform the Plan to include only prudent investments;

J.    Certify the Subclasses, appoint the Plaintiffs as respective class representatives, and appoint Kozyak Tropin & Throckmorton LLP and Seeger Weiss LLP as Class Counsel;

K.    Award to the Plaintiffs and the Class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

L.    Order the Defendants to pay interest to the extent allowed by law; and

M.    Grant any such other equitable or remedial relief as this Court deems appropriate.

## X.    JURY DEMAND

The Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

*/s/Benjamin J. Widlanski*
Benjamin J. Widlanski
bwidlanski@kttlaw.com
Tal J. Lifshitz
tjl@kttlaw.com
Katherine A. Mitchell
kmitchell@kttlaw.com
Clayton J. Schmitt
cschmitt@kttlaw.com
**KOZYAK TROPIN &
THROCKMORTON LLP**
2525 Ponce de Leon Blvd., 9th Floor
Coral Gables, Florida 33134
Telephone: (305) 372-1800

David R. Buchanan
dbuchanan@seegerweiss.com
Shauna Itri
sitri@seegerweiss.com
**SEEGER WEISS LLP**
55 Challenger Road
Ridgefield Park, New Jersey 07660
Telephone: 973-639-9100

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 18, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ David R. Buchanan*